# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JANE FLINT,

                  Plaintiff,

v.

THE CITY OF MILWAUKEE,
MILWAUKEE COUNTY,
PHILLIP C. SIMMERT, PAUL FELICIAN,
KENNETH DAUGHERTY,
JAIMIE HEWITT, GREGORY COLKER,
DAVID JONAS, ANDREW MOURTY, and
JUTIKI JACKSON,

                  Defendants.

Case No. 14-CV-333-JPS

ORDER

## 1.      INTRODUCTION

The plaintiff, Jane Flint ("Flint"), pursuant to 42 U.S.C. § 1983, filed a complaint in this matter on March 25, 2014, alleging the defendants violated her civil rights. (Docket #1). On October 24, 2014, the Court granted, *inter alia*, Flint's motion to amend the complaint to add Milwaukee Police Department ("MPD") Sergeant Jutiki Jackson[1] as a defendant (Docket #39), and thus the first amended complaint (Docket #41) became the operative complaint in this matter.

Flint's amended complaint alleges two overarching causes of action, both rooted in the Fourth Amendment: (1) an unlawful seizure of two of her dogs—they were shot and killed during the execution of a search warrant at her residence—against Sgt. Jackson, Detective Phillip C. Simmert, Lieutenant Paul Felician,[2] Officer Kenneth Daugherty, Officer Andrew Mourty, Officer Jamie Hewitt, and Officer Gregory Colker (collectively "the

---

[1]Jackson was a sergeant during the events at issue; he is now a captain.

[2]Felician was a lieutenant during the events at issue; he is now a captain.

City defendants"), *id.* at 16-17; and (2) unlawful detention against the City defendants, *id.* at 17, and Milwaukee County Deputy Sheriff David Jonas, *id.* at 18. Flint also alleges a failure to intervene claim against all of the City defendants. *Id.* at 17.

The City of Milwaukee ("the City") and Milwaukee County ("the County") are defendants in this action because Flint alleges that both municipalities "are liable to defend this action against the [d]efendants, and to satisfy any judgment entered against them, by virtue of Wis. Stat. § 895.46." *Id.*

 On November 14, 2014, cross-motions for summary judgment were filed; specifically: (1) the County and Deputy Jonas filed a motion for summary judgment on the only claim against them—unlawful detention (Docket #48); (2) the City and the City defendants filed a motion for summary judgment on both claims against them (Docket #53); and (3) Flint filed a motion for partial summary judgment, requesting resolution of the liability aspect of both causes of action in her favor, but reserving the question of damages for a jury. (Docket #49). Both the City defendants and Deputy Jonas have asserted that they are entitled to qualified immunity on Flint's claims.

On January 13, 2015, the Court, in light of the Supreme Court's December 15, 2014 decision in *Heien v. North Carolina*, — U.S. —, 135 S. Ct. 530 (2014), requested that the parties file supplemental briefs "explaining what effect, if any, the *Heien* decision ha[d] on their respective arguments in support of and in opposition to summary judgment." (Docket #84). The parties did so, (*see* Docket #85, #86, #87), and thus on January 27, 2015, all three motions for summary judgment were fully briefed and ready for adjudication.

Accordingly, the Court now turns to those motions and will deny Flint's motion in its entirety, grant in part and deny in part the City defendants' motion, and grant Deputy Jonas's motion for the reasons outlined below.

2.    LEGAL STANDARDS

2.1    Summary Judgment

When a party files a motion for summary judgment, it is their "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat. Ret. Fund*, — F.3d —, 2015 WL 499571, at *5 (7th Cir. Feb. 6, 2015) (citing Fed. R. Civ. P. 56(a)). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to have a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586 (1986); namely, the party in opposition "must set forth specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e).

"Where…the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claims." *Hotel 71 Mezz*, 2015 WL 499571, at *5. When analyzing whether summary judgment should be granted, a court must draw all reasonable inferences from the materials before it in favor of the non-

moving party. *See Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). When a court denies a motion for summary judgment it "reflects the court's judgment that one or more material facts are disputed or that the facts relied on by the motion do not entitle the movant to judgment as a matter of law." *Hotel 71 Mezz*, 2015 WL 499571, at *6.

### 2.2      Qualified Immunity

As noted above, the City defendants and Deputy Jonas have both argued that they are entitled to qualified immunity. As such, the Court will briefly sketch out the legal standard for qualified immunity before more fully analyzing it in relation to each of Flint's claims and the parties' respective motions for summary judgment.

Qualified immunity is available when a defendant's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Beaman v. Freesmeyer*, 776 F.3d 500, 508 (7th Cir. 2015). Qualified immunity is not a defense, it is an immunity from suit, *i.e.*, an entitlement not to stand trial. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Consequently, the Supreme Court has repeatedly emphasized the importance of resolving qualified immunity at the earliest possible stage in litigation. *Pearson*, 555 U.S. at 232.

A court must answer two questions to determine if qualified immunity applies: first, whether a constitutional right "would have been violated," *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)); and second, "whether the right at issue was clearly established at the time and under the circumstances presented." *Beaman*, 776 F.3d at 508; *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir.

2012).[3] To answer the first question, "a court must decide whether the facts that a plaintiff has…shown make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232 (citing *Saucier*, 533 U.S. at 201).

Flint can provide the answer to the second question—whether a right was "clearly established" at the time and under the circumstances presented—"in at least two ways: (1) he can point to a clearly analogous case establishing the right to be free from the conduct at issue; or (2) he can show the conduct was 'so egregious that no reasonable person could have believed that it would not violate established rights.'" *Beaman*, 776 F.3d at 508 (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."); *Viilo*, 547 F.3d at 710-11. Thus, novel factual circumstances are no bar to showing a clearly established right, "so long as the state of the law at the time gave the defendants fair warning that their conduct was unconstitutional." *Beaman*, 776 F.3d at 509 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012) ("A constitutional right is clearly established when 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'") (quoting *Saucier*, 533 U.S. at 202).

---

[3]Prior to 2009, courts were instructed to analyze the questions in order, *see Pearson*, 555 U.S. at 232 (noting that *Saucier* made addressing the questions in order "a mandate"), but in *Pearson* the Supreme Court held that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Id.* at 236.

3.      DISCUSSION

3.1      Fourth Amendment Seizure Claim for Killing of the Dogs

Flint alleges that the City defendants violated her Fourth Amendment right to be free from unreasonable searches and seizures when they shot and killed two of her dogs while executing a search warrant at her residence. (Docket #41 at 16-17). The Court will begin by summarizing the undisputed facts and the parties' various arguments in support of and against summary judgment; afterwards, the Court will determine whether either party is entitled to judgment as a matter of law and whether qualified immunity applies.

3.1.1   Undisputed Facts

On or around May 6, 2010, Illinois authorities took a complaint from a woman[4] who alleged that Terry Cullen ("Cullen")—Flint's employer, (Docket #75, ¶ 21)—was in possession of four "Tibetan Wolves" and also possibly illegal animals and reptiles at a residence in Milwaukee. *Id.* at ¶ 9. During a conversation with Detective Simmert and Officer Hewitt on May 7, 2010, the woman alleged that Cullen sexually assaulted her at his house; she further stated that Cullen had taken her to Flint's house before the assault. *Id.* at ¶ 13. The woman informed the officers that there was a crocodile living in the bathtub at Flint's residence, and she believed that it was illegal to be in possession of that type of crocodile. *Id.* at ¶ 15. That same day, Detective Simmert drove the woman past Flint's and Cullen's residences and she confirmed those were the places she had been; in addition, she said Flint's residence was the location where the wolves were. *Id.* at ¶17. Detective

---

[4]While the filings identify this woman, the Court sees no need to publish her name in this order, especially given the nature of her allegations against Cullen.

Simmert later learned, via an internet search, that the "Tibetan Wolves" were actually Tibetan Mastiffs, a domesticated breed of dog. *Id.* at ¶ 19. And, Detective Simmert spoke with Flint on May 10, 2010, and, among other things, discussed Flint's dogs. (Simmert Dep. at 39:19-40:13).

Based on the belief that there may be a critically endangered alligator living in the bathtub at Flint's residence (after consulting with the Department of Natural Resources ("DNR")), on May 12, 2010, at 8:53 a.m., Detective Simmert applied for and received a search warrant to search Flint's residence.[5] (Docket #75, ¶¶ 25, 28); (Docket #82, ¶ 101); (Docket #69, ¶ 30). The search warrant for Flint's residence was for the purpose of investigating a violation of Wis. Stat. § 29.604, which, *inter alia*, criminalizes certain conduct related to endangered and threatened species.[6] (Docket #75, ¶ 28). The search warrant did not authorize a no-knock entry. *Id.* at ¶ 31; (Docket #69, ¶ 49). Detective Simmert requested DNR Warden Nick Blankenheim assist during the execution of the search warrant because of the alleged presence of alligators and anacondas. (Docket #75, ¶ 26); (Docket #69, ¶ 31).

Detective Simmert and Lt. Felician were responsible for overseeing the planning and execution of the search warrant. (Docket #82, ¶ 121); (Docket #75, ¶ 32). Sgt. Jackson, via telephone, assigned Tactical Enforcement Unit ("TEU")[7] Officers Daugherty and Mourty to execute the search warrant at

---

[5] The search warrant for Flint's residence was obtained in conjunction with a second search warrant for Cullen's residence. It seems clear that searching Flint's residence was part of the larger investigation into the sexual assault allegations against Cullen.

[6] Wis. Stat. § 29.604(4)(a) provides, in pertinent part, that "no person may take, transport, possess, process or sell within this state any wild animal specified by the department's endangered and threatened species list."

[7] The TEU is analogous to a SWAT team. (Docket #69, ¶ 37).

Flint's house; the search warrant was classified as "low risk." (Docket #69, ¶ 39). Officers Daugherty and Mourty were assigned to breach the door, which normally requires two people. (Daugherty Dep. at 14:8-15:1).

Fifteen minutes prior to executing the search warrant, Detective Simmert held a short—fifteen minutes or less—briefing outside the police administration building to go over the search warrant. (Docket #75, ¶ 44); (Docket #69, ¶ 40). All of the City defendants were present at the briefing, except Sgt. Jackson and Officer Colker. (*See, e.g.,* Docket #75, ¶ 72). During the briefing, the officers discussed that the search warrant was being executed in connection with a sexual assault investigation, there was supposedly an endangered alligator or crocodile in the house, and there would be big dogs and anacondas. (Docket #75, ¶¶ 45, 46, 50); (Docket #69, ¶ 40). With respect to the dogs, Detective Simmert informed everyone that four Tibetan Mastiffs were at the residence; however, there was no tactical discussion regarding how to handle the dogs. (Docket #75, ¶ 50). At some point the officers did discuss contacting the Milwaukee Area Domestic Animal Control Council ("MADACC") to help assist with executing the warrant. (Docket #75, ¶¶ 26, 79 ). Yet MADACC was not called until, at the very earliest, after MPD had entered Flint's residence. (Docket #52, Ex.3 at 7).

Before execution of the search warrant, Officers Daugherty and Mourty were both concerned about what they heard at the briefing regarding, *inter alia*, the presence of dogs[8]; accordingly, Officer Daugherty

---

[8]Officer Daugherty was concerned that because it took two officers to breach the door and there were dogs, they would have no cover and thus needed additional officers. (Daugherty Dep. at 16:11-17:10). In addition to the dogs, Officer Mourty was concerned about the size of the building, the presence of video cameras, and the possible presence of alligators and anacondas. (Mourty Dep. 20:9-22).

called Sgt. Jackson to inform him of what they learned at the briefing and to ask for more tactical officers. (Docket #69, ¶ 41). Sgt. Jackson denied this request and told the officers to proceed. *Id.* at ¶ 42.

On his way over to Flint's house, Detective Simmert contacted Flint and let her know that MPD was going to be executing a search warrant on her house. (Docket #75, ¶ 59); (Docket #69, ¶ 46). Detective Simmert's intention in making this call was to give Flint an opportunity to control her dogs, thereby avoiding any number of bad outcomes that could occur. (Docket #75, ¶ 59); (Simmert Dep. at 145:1-147:10). Flint informed Detective Simmert that she was at work but could be home in twenty minutes and would be glad to control the dogs. (Docket #75, ¶ 60); (*see also* Docket #69, ¶46).

When Detective Simmert arrived on scene, he decided not to wait for Flint to arrive before executing the search warrant. (Docket #75, ¶ 63); (Docket #69, ¶ 46). Lt. Felician appears to have concurred in this decision and directed the officers to proceed. (Docket #69, ¶ 47). The reasons Detective Simmert gave for proceeding with the search warrant without waiting for Flint were: (1) a concern for officer safety; (2) the lack of the element of surprise; and (3) the welfare of the animals inside. (Docket #69, ¶ 46); (Docket #75, ¶ 64).

Thus, at 1:34 p.m. on May 12, 2010, Detective Simmert executed the search warrant at Flint's residence. (Docket #75, ¶ 71); (Docket #69, ¶ 48). On scene, in addition to the City defendants noted above, was DNR Warden Blankenheim. Officers Daugherty and Mourty approached the door and Officer Mourty became concerned because he could hear what sounded like numerous large dogs. (Mourty Dep. at 25:14-26:10); (*see also* Docket #82,

¶ 150). The officers knocked loudly, announced "police," and then breached the door. (Docket #69, ¶¶ 49, 51, 52); (Docket #75, ¶ 75).

Upon entering the house, Officer Daugherty immediately observed the dogs. (Docket #69, ¶ 54). Officers Daugherty and Mourty entered into the kitchen area and the dogs were located off to the right, in the living room. (*See* Docket #52, Ex. O (DVD)); (Docket #69, ¶ 57). After the kitchen and immediate areas had been cleared, Officer Hewitt, Lt. Felician, and others entered the premises. (Docket #75, ¶ 75). Officer Hewitt took video of the premises, although the camera is turned off repeatedly. (*See* Docket #52, Ex. O (DVD)); (Docket #75, ¶ 84).

At this point, the evidence becomes very conflicting. For the sake of brevity and clarity, the Court will summarize the events with limited citation to the record. According to Officers Daugherty and Mourty, they placed a garbage can between the kitchen and the living room to prevent the dogs from approaching them. And, the video does appear to show a garbage can between the kitchen and the living room prior to the shooting of the dogs. (*See* Docket #52, Ex. O (DVD)). The video also shows the dogs behind a baby gate as well. *Id.* Therefore, it appears there were two barriers between the officers and the dogs.

Officer Daugherty stated that he kept the dogs at bay by aiming his M4 carbine rifle at them and flashing the light on his gun. This made the dogs scurry back. Officer Daugherty also stated that at this point in time, it would have been reasonable to attempt to use a dog snare to catch the dogs, and believes MADACC could have done so. While Officer Daugherty was keeping the dogs at bay, Officer Mourty continued to search the areas adjacent to the kitchen.

The video shows officers walking around the kitchen and areas adjacent to it; the officers do not appear to fear for their safety, as laughter is heard. (*See* Docket #52, Ex. O (DVD)). The video shows many animals in cages and boxes, and what appears to be a crocodile or alligator in a large tub. *Id.* The dogs can also be heard barking in the background during the entirety of the pre-shooting video.

At some point, Officer Mourty stated that he told the other officers that there was too much going on—due to the sheer number and type of animals—and that everyone should back out of the house. However, other testimony, specifically that of Officer Hewitt, indicates that while Officer Hewitt was told to back out, a decision was made that Officers Daugherty and Mourty should clear the rest of the house. To do so, the officers would first need to go through the living room, where the dogs were located. Regardless, it is around this point in time that two of the dogs were shot.

Officer Daugherty stated that while the dogs had responded to the flashes of light from his M4 carbine rifle before, one dog continued to advance in spite of the light, got down in what he interpreted as an attack posture, and bared its teeth. At this time Officer Daugherty was still in a position behind the garbage can. Officer Daugherty believes he said "stand by" and then when the dog charged, he shot it three times. Then, according to Officer Daugherty, another of the dogs came charging, growling and barking, and leapt at him over the dog he had just killed. Thus, he shot at that dog as well, this time discharging his gun nine times. Officer Daugherty stated that the second dog landed mere inches away from him,.

The only officer that witnessed the actual shooting of the dogs, according to the City defendants, was Officer Daugherty. Officer Hewitt and Detective Simmert were outside when it occurred, and Lt. Felician was in a

warehouse portion of the residence. (*See* Docket #69, ¶ 71). According to Officer Hewitt, from outside the residence she heard the tactical officers inside yelling "back up, back up" before hearing gun shots.

It is also disputed whether MADACC was called just prior to, at the same time, or after the dogs were shot. Nevertheless, MADACC did not arrive on scene until many minutes after the dogs were killed.

At some later point in time, Officer Hewitt returned to the kitchen area and shot additional video. (*See* Docket #52, Ex. O (DVD)). According to MPD, the two dead dogs are shown on the video in the same position they ended up after Officer Daugherty shot them. (Docket #69, ¶ 83). Just after the video resumes, someone steps around the dogs' bodies and can be heard stating "this is beyond our scope; that's all I keep thinking, this is way beyond our scope." (*See* Docket #52, Ex. O (DVD)). One dog is positioned just behind the baby gate and the other is farther back, towards the living room. *Id.*

Flint arrived after her dogs had been shot, but before their bodies had been removed by MADACC. (Docket #75, ¶ 91). Flint was understandably upset when she arrived on scene and was informed that two of her dogs had been killed. (Docket #75, ¶ 92).

### 3.1.2    Unreasonably Killing Dogs Violates the Fourth Amendment

The Court begins by determining whether the City defendants' conduct would have violated the Fourth Amendment. *Viilo*, 547 F.3d at 709-10.

The Seventh Circuit has made answering this question eminently easy. Namely, "[e]very circuit that has considered the issue has held that the killing of a companion dog constitutes a 'seizure' within the meaning of the Fourth Amendment." *Id.* at 710; *see also Carroll v. Cty. of Monroe*, 712 F.3d

649, 651 (2d Cir. 2013) ("As a number of our sister circuits have already concluded, the unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment."). And the Seventh Circuit elaborated that "[b]oth common sense, and indeed Wisconsin law, counsel that the use of deadly force against a household pet is reasonable *only if the pet poses an immediate danger and the use of force is unavoidable.*" *Id.* (citation omitted) (emphasis added).

This makes sense, given that "[t]he emotional attachment to a family's dog is not comparable to a possessory interest in furniture." *San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005). Dogs, for many people, are akin to children; they are, quite often, treated with the same care, kindness, and respect as any other member of the family. And, the loss of a dog is often devastating to those who have cared for him or her, *see id.*, reflecting the high esteem and sacred place they hold in people's hearts. *See Carroll*, 712 F.3d at 651 (stating that the shooting of a dog is "a severe intrusion given the emotional attachment between a dog and an owner"). Dogs are referred to as "man's best friend" for a reason.

Thus, to show that her Fourth Amendment rights were violated, Flint must show that the killing of her dogs was unreasonable. She alleges unreasonableness on multiple fronts: (1) that the City defendants acted unreasonably by failing to have any articulable plan to deal with the dogs, other than shooting them; (2) that the on-scene officers acted unreasonably by creating the very situation that compelled shooting the dogs; and (3) that Officer Daugherty acted unreasonably when he shot the dogs because they were not a threat to him or others. The Court will address each of Flint's grounds in turn.

### 3.1.2.1   Failure to Plan

Flint alleges that "[t]here were no instructions given, nor plans created, in regards to how to deal with the dogs, other than shooting them if they posed a threat." (Docket #50 at 13). And, this was unreasonable given that "the [City] [d]efendants knew for at least five days prior to May 12th that they would be conducting a search at Ms. Flint's residence, where the dogs were." *Id.* at 12. Flint suggests that MPD could have: (1) discussed the dogs with DNR when consulting with them about the alleged alligators at Flint's residence; (2) learned the names of the dogs so that they could communicate with them in a friendly manner; (3) brought treats or other distractions to contain the dogs in a non-violent manner; (4) planned to use pepper spray instead of shooting the dogs; (5) brought a dog snare to attempt to catch the dogs; and (6) called MADACC prior to executing the search warrant instead of minutes before or after the dogs were shot. (Docket #68 at 5-6).

The City defendants argue that Flint has failed to identify any statements by the City defendants that "the officers explicitly discussed, stated or even decided individually that they would deal with the dogs simply by shooting them." (Docket #81 at 2). Strangely, the City defendants' argument appears to be that there was no plan to shoot the dogs because there was little or no planning at all. *See id.* (stating that "the uncontroverted facts establish *that without explicit planning, but, perhaps, only with "common sense" or training and experience,* the tactical officers effectively kept the dogs at bay . . .") (emphasis added); *id.* ("The facts [Flint] actually adduces amount to nothing more than evidence that none of the supervising or tactical officers *explicitly planned certain actions to capture or contain the dogs in a certain manner.*") (emphasis added).

The only plan that the City defendants can articulate is the plan to get MADACC on scene to help deal with the dogs. (Docket #81 at 6); (Docket #73 at 5). But, it is undisputed that MADACC was called *during* the execution of the search warrant, shortly before or after the dogs were shot. The City defendants counter this by stating that "[e]ven assuming that the call came after the shooting, there is no dispute that the officers intended to call MADACC to catch the animals, and just may have waited too long to place the call," which "amounts to nothing more than mere negligence." (Docket #81 at 6); (Docket #54 at 18) ("Flint might argue that the animal control officers could have been brought in sooner but such a claim amounts to nothing more than the argument that the officers were negligent in the way they dealt with the dogs.").

Finally, as to the various ways the City defendants could have planned for the execution of the search warrant offered by Flint, the City defendants assert that Flint cannot prove that any of those methods would have been successful. *Id.* at 3-8. Thus, the City defendants argue that, at bottom, their failure to use any of these methods amounts to mere negligence and "[n]egligence is insufficient to support a Fourth Amendment claim" under § 1983. *Id.* at 4.

### 3.1.2.2   On-Scene Actions

Flint alleges that the on-scene actions of MPD were unreasonable in two distinct ways. First, she alleges that by proceeding with the search warrant instead of waiting for Flint to come home and assist with controlling her dogs, the City defendants acted unreasonably. (*See, e.g.*, Docket #50 at 14-16). Specifically, Flint contends that the City defendants' purported reasons for executing the search warrant instead of waiting for

Flint—namely, concerns about officer safety, the welfare of the animals,[9] and losing the element of surprise—are specious. *Id.* at 15; (Docket #68 at 3) (stating that "the [City] [d]efendants executed the search warrant without waiting for Ms. Flint, despite having no articulable reason for refusing to wait 20 minutes").

The City defendants aver that the reasons for proceeding with the search warrant do not show the officers acted unreasonably. Rather, "[t]he lieutenant and detective were concerned about jeopardizing officer safety by waiting—there were surveillance cameras, and there may have been someone in the premises who could harm the officers, especially with additional time to plan." (Docket #54 at 16-17); (Docket #73 at 7) (observing that the existence of surveillance cameras meant the officers could have been observed without themselves seeing someone inside). And, "while the officers did not expect someone to be in the house and Flint had represented in a telephone call that she was away at work, the officers did not know that no one was in the premises." (Docket #73 at 7).

And, with regard to safety in general, the City defendants aver that "[t]he supervisors and officers could not…simply focus their attention on the dogs, and allow unarmed civilians such as MADACC personnel into the premises without first searching it for the presence of people who might harm a person." *Id.* Finally, the City defendants assert that "the officers knew that there would be dogs in the home and they too could have been used to attack someone coming to the house." *Id.*

---

[9]The City defendants do not press the contention that the officers were concerned for the safety for the animals inside any further. Perhaps because of the irony of doing so, given that the officers ended up killing two animals inside.

Second, Flint contends that, even if the search warrant was executed properly at the outset, the City defendants nevertheless placed themselves in a situation to shoot the dogs by choosing to enter the area where the dogs were located (and safely contained), instead of backing out and waiting for MADACC or Flint to control the dogs. (Docket #50 at 16-17). To wit, Officer Hewitt testified that the tactical officers had personnel back out so that they could proceed to clear the residential area; this decision, according to Flint, would force the officers to confront the dogs to do so. And, proceeding in that manner would be unreasonable, given that Flint was on her way home and the officers could have also waited for MADACC to arrive (assuming they had already been called).

The City defendants counter this second point by stating that Officer Hewitt did indeed state that, but she did not observe exactly what happened since she had backed out, which does not actually call into question the testimony of Officers Daugherty and Mourty. Namely, it is still possible that the dogs charged at them as they themselves were backing out or holding in place.

### 3.1.2.3  Officer Daugherty's Killing of the Dogs

Finally, Flint contends that even if the dogs came towards Officer Daugherty as the City defendants suggest, the DVD evidence does not support the testimony of Officer Daugherty as to how the events actually occurred. (Docket #68 at 7-12). Specifically, Officer Daugherty stated that the first dog charged and was shot, and then the second dog charged, jumped over the first, and was shot inches before reaching Officer Daugherty.

The City defendants appear to concede that the video does not exactly corroborate Officer Daugherty's recounting of the events. Namely, "the police video and testimony corroborates rather than undermines

Officer Daugherty, *at least with respect to the second dog.*" (Docket #54 at 15) ("Consistent with [Officer] Daugherty's testimony that the second dog leap[t] over the first shot dog and came very close to [Officer] Daugherty's position at the doorway between the kitchen and family room, the video shows a dog lying very close to the doorway with its head facing towards the kitchen."). Of course, this begs the question: why was the first dog so far away from where Officer Daugherty represented he was? The City defendants appear to offer no answer to this question. *Id.* at 15 ("The other dog appears to be lying perpendicular to the doorway, some distance away. The position of the body does not, however, indicate whether the dog dropped instantly…or whether it began to turn away after the first shot…There would, therefore, be nothing but speculation that the dogs were retreating from [Officer] Daugherty.").

Flint also argues that the video does not corroborate Officers Daugherty and Mourty with respect to where the dogs were and what they were doing—barking or growling. The video shows the dogs quite a distance back from the kitchen when they are first recorded—which was during the time officers are doing their initial search of the kitchen and adjacent areas. And, while Officers Daugherty and Mourty stated that the dogs were growling the entire time officers were there, the video at *no time* records the dogs growling or doing anything other than barking.

The City defendants attempt to rebut this argument by pointing out that the video camera that Officer Hewitt used was turned off repeatedly during the time before the dogs were shot. Thus, according to the City defendants, "the video recording of the dogs before the shooting is only fleeting and the audio recording, though longer, appears to capture sounds from other areas and is often obscured by officers' voices." (Docket #81 at 8).

Thus, "[i]t is mere speculation, therefore, that one or more of the dogs were not growling given the poor recording." *Id.*

At bottom, Flint argues that Officer Daugherty was not in immediate danger and his shooting of the dogs was avoidable.

### 3.1.3   Genuine Disputes of Material Fact Preclude Granting Summary Judgment for Either Party

The Court need not belabor the analysis much on the killing of the dogs. This case epitomizes: (1) contested facts; (2) credibility contests; and (3) swirling unknowns. A reasonable jury, considering the contested issues, against the backdrop of the DVD evidence, could find for either party, on all three points of unreasonableness asserted by Flint.

There is certainly evidence to support Flint's theory of the case: namely, that the police entered her residence without a plan, *see Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) ("In constitutional-tort cases as in other cases, 'a man is responsible for the natural consequences of his actions.'") (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)), created the situation that necessitated the use of force, and then further acted unreasonably by forging ahead instead of waiting for Flint or MADACC. *See Brown v. Blanchard*, 31 F. Supp. 3d 1003, 1010 (E.D. Wis. 2014) (noting that "an officer who shoots a suspect in an effort to protect himself cannot escape liability if the danger he faced was created by his own unreasonable conduct") (citing *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993)).

A jury, finding that the officers acted reasonably at one step, would also be free to find that, in light of the totality of the circumstances, the City defendants' conduct, overall, was unreasonable. *See Deering v. Reich*, 183 F.3d 645, 649, 652 (7th Cir. 1999) (noting that the totality of the circumstances is not "limited to the precise moment when [the officer] discharged his

weapon," but includes "all of the events that occurred around the time of the shooting"); *Hells Angels*, 402 F.3d at 975 ("We look to the totality of the circumstances to determine if the destruction of property was reasonably necessary to effectuate the performance of the law enforcement officer's duties."); *Carroll*, 712 F.3d at 651 ("To determine whether a seizure is unreasonable, a court must 'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion' and determine whether 'the totality of the circumstances justified [the] particular sort of… seizure.'") (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). Unreasonable, that is, because the shooting of the dogs was clearly avoidable, *see Ganwich v. Knapp*, 319 F.3d 1115, 1122 (9th Cir. 2003) ("A seizure becomes unlawful when it is 'more intrusive than necessary.'") (quoting *Florida v. Royer*, 460 U.S. 491, 504 (1983)), and there was no immediate danger, but that which was caused by the City defendants' own actions. *See Viilo*, 547 F.3d at 710.

A reasonable jury could also find, based on the foregoing evidence, that the City defendants, despite having an admittedly questionable plan, did nothing wrong up and through the shooting. Specifically, the jury could find that after executing the search warrant, the officers attempted to retreat and wait for assistance, and during that time, the dogs attempted to attack and Officer Daugherty had no choice but to shoot. *See, e.g., Hells Angels*, 402 F.3d at 978 ("The Fourth Amendment allows officers to use a certain amount of force because they are 'often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving…'") (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

In light of the foregoing, the Court finds that wading any further into this morass would usurp the role of the jury, whose province is fact-finding,

credibility assessments, and weighing contested facts in light of the circumstances. The only question that remains then, is whether the City defendants are nonetheless entitled to qualified immunity because their conduct did not violate a clearly established right.

### 3.1.4 The City Defendants Are Not Entitled to Qualified Immunity On the Unlawful Seizure Claim

The City defendants assert, almost half-heartedly, that qualified immunity nonetheless bars Flint's claim for killing her dogs because Flint cannot show they violated a clearly established right. Conceding that the Seventh Circuit has found that unreasonably killing dogs is a Fourth Amendment seizure, the City defendants nonetheless argue that "Flint cannot show that 'various courts have agreed that…conduct [comparable to that of these officers] is a constitutional violation under facts *not distinguishable in a fair way* from the facts presented in the case at hand…." (Docket #54 at 19) (quoting *Campbell v. Peters III*, 256 F.3d 695, 701 (7th Cir. 2001)); (Docket #73 at 9) (reiterating that "Flint has not cited to any decision by the [S]eventh [C]ircuit or by a number of other courts indicating a consensus that what the officers actually did here was a violation of the dogs' owner's rights.").

The City defendants' argument is all but disingenuous. First, the Seventh Circuit stated in *Viilo* (in 2008), in the context of qualified immunity for shooting dogs, that analogous cases were unnecessary given its prior holding in *Siebert* which "held that domestic animals are 'effects' within the meaning of the Fourth Amendment." 547 F.3d at 711 (citing *Siebert v. Severino*, 256 F.3d 648, 656 (7th Cir. 2001)). Thus, the court held that "[t]he *Siebert* decision is enough to give police officers reasonable notice that unnecessarily killing a person's pet offends the Fourth Amendment." *Id.* So,

the City defendants have been on notice since 2001 that unnecessarily killing a person's dog violates a constitutional right.

But, even supposing that analogous cases are necessary here, as the Ninth Circuit pointed out in *Hells Angels*, "the Supreme Court recognized [in *Hope v. Pelzer*, 536 U.S. 730 (2002)] that previous cases do not have to be '*fundamentally similar*' and that officials can still be on notice even in novel factual circumstances." 402 F.3d at 977 (quoting *Hope*, 536 U.S. at 741) (emphasis added). Nor does a plaintiff necessarily need *myriad* courts to have agreed on the issue, so long as Flint can "point to a clearly analogous case establishing the right to be free from the conduct at issue." *Beaman*, 776 F.3d at 508.

Second, the City defendants' argument that various courts have not agreed that conduct comparable to that which occurred here is a constitutional violation obtusely ignores the decisions of the Ninth Circuit in *Hells Angels* and the Second Circuit in *Carroll*; both decisions discuss the failure of officers to have a plan for dealing with dogs (other than shooting them) resulting in their death, *see Carroll*, 402 F.3d at 652-54; *Hells Angels*, 402 F.3d at 976-78—which is a conclusion a reasonable jury could reach here.

In *Hells Angels*, the Ninth Circuit found that shooting dogs during the execution of a search warrant was unreasonable when, despite having "a week to plan the execution of [the search warrant]," and "advance knowledge of the presence of two guard dogs," the "full extent of the plan to protect the entry team from the dogs was to either 'isolate' or shoot the dogs." 402 F.3d at 976. The Ninth Circuit also found that the "little plan" of one of the officers, which was "pok[ing] [the dogs] through the fence with his shotgun to try and scare them," and if that was unsuccessful, to "'engage' the dogs to ensure the safety of [the officers]," was no plan at all; namely,

"despite a week to plan for the entry, the officers developed no realistic plan other than shooting the dogs while serving the search warrants." *Id.*

Additionally, the *Hells Angels* court was unconvinced by the officers' purported reasons for the intrusion; specifically: (1) the need to execute the search warrant to seek evidence for a murder; (2) the need for stealth and speed; and (3) the safety of the officers. *Id.* First, the court was not convinced of the need to execute the search warrant as it was, given that "none of the plaintiffs were potential suspects" in the murder. *Id.* Second, the court found that the officers need for stealth and speed was torpedoed by their own conduct; to wit, breaking down the door with a ram and shooting at the dogs. *Id.* Third, and most importantly, the *Hells Angels* court found that, "[w]hile the governmental interest of safety might have provided a sound justification for the intrusion had the officers been surprised by the presence of the dogs, the same reasoning is less convincing given the undisputed fact that the officers knew about the dogs [for a week]." *Id.* at 977. In particular, this gave the officers "substantial time to develop strategies for immobilizing the dogs." *Id.* What happened, instead, was that "the officers created an entry plan designed to bring them in close proximity of the dogs without providing themselves with any non-lethal means for controlling the dogs," leaving themselves no choice "but to kill the dogs in the event they—quite predictably—attempted to guard the home from invasion." *Id.* (internal quotation marks omitted).

The Ninth Circuit concluded by stating that the shooting of dogs is impermissible when "less intrusive, or less destructive, alternatives exist," especially when officers are not "reacting to a sudden unexpected situation" where exigent circumstances might excuse the conduct. *Id.* at 978. Therefore, "the failure to develop any realistic non-lethal plan for dealing with the dogs

is simply not the type of reasonable mistake in judgment" entitling officers to qualified immunity. *Id.*

In *Carroll*, the Second Circuit concurred with the Ninth Circuit, noting that "the failure to plan adequately for the presence of dogs during a search could contribute to a Fourth Amendment violation under certain circumstances." 712 F.3d at 652. This was especially so, according to the court, where "officers ha[ve] ample time to utilize non-lethal means without compromising their safety or the search," and particularly where officers are "not executing no-knock warrants." *Id.* But, even failing to plan during no-knock warrants might be impermissible. *Id.* at 653 ("There may well be circumstances under which a plaintiff could prove that lack of an adequate plan rendered the shooting of his or her dog unreasonable even during execution of a no-knock warrant, and we urge the defendants to consider whether more comprehensive training and planning would better serve the public, as well as officers, in the future.").

The City defendants' attempt to evade *Hells Angels* on two fronts, neither of which is convincing. First, the City defendants argue that *Hells Angels* is readily distinguishable because: (1) *Hells Angels* involved the killing of dogs in a backyard and here, "the dogs were all inside the very confined space of the very cluttered premises," (Docket #73 at 4); and (2) here, "no officer shot either dog upon sight and without any effort to use non-lethal means"—*i.e.* the light on the M4 Carbine, the large trash can that was placed between the officers and the dogs, and the attempts of Officer Daugherty to use verbal commands to keep the dogs back—whereas in *Hells Angels*, there was no indication that such measures were used. As such, the City defendants argue that "[g]iven all the factual distinctions between this case

and the searches considered in *Hells Angels*, this Court should not be persuaded to follow that decision here." *Id.* at 6.

Second, the City defendants argue that the Ninth Circuit "either did not have evidence before it or the benefit of argument that training, experience, and just 'common sense' can be a legally sufficient substitute for dealing with guard dogs in the course of executing a search warrant." *Id.* In support of this proposition the City defendants cite to the fact that Officer Mourty had prior training on dealing with dogs, and Officers Daugherty and Mourty had "substantial experience in executing searches." *Id.* The City defendants then double down on the "common sense" argument, stating that "there is the apparent and *partially successful* role of 'common sense' and improvisation in dynamic and unknown circumstances; [Officer] Daugherty backed up the dogs and kept them at bay by using a light on his weapon and a large garbage can apparently found in the home." *Id.* Finally, the City defendants argue that the requirement in *Hells Angels* to have a plan is a decision that "should not be followed because if applied in this context could result in an unreasonable sacrifice of officer safety." (Docket #81 at 1). However, the City defendants do not support this final proposition with any facts or arguments.

However much the City defendants would like to escape the *Hells Angels* (and *Carroll*) they cannot do so. In the Court's view, *Hells Angels* is on all fours with the facts in this case. While it is true that the defendants in *Hells Angels* shot the dogs in a backyard and Flint's dogs were shot inside her home, this is a distinction without a difference. The focus is not on the events immediately preceding the shooting, but whether there were appreciable efforts to develop a plan to *avoid a shooting altogether.* And, as stated above, a reasonably jury could find that the City defendants made no such plan.

This case is also similar to *Hells Angels*, in that both search warrants were executed with little or no planning and were not of the type that needed to be executed imminently.

Moreover, to the extent that the City defendants argue that "common sense" and improvisation can supplant the need for a plan altogether, they misunderstand what "planning" actually entails. "Planning" is to engage in "the act or process of making a plan to achieve or do something." *Planning Definition,* Mirriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/planning (last visited March 3, 2015). A person cannot be said to have a plan if the details of the plan are merely a reaction to events transpiring in front of him or her. Stated another way, using common sense and training in a dynamic situation might prepare a person for certain events that might transpire, but that knowledge does not magically transform into an articulable plan. Nor is that the type of plan that the courts in *Hells Angels* or *Carroll* could possibly have intended. Nascent or non-existent plans are insufficient; to state it colloquially, you can't just "wing it." Finally, in making this argument, the City defendants also ignore that Officer Daugherty—*the person who actually shot the dogs*—stated that he could not recall having any formal training on how to deal with dogs.

Finally, while the City defendants argue that requiring officers to have non-lethal methods to deal with dogs could jeopardize officer safety, they fail to support that argument. Nor, in the Court's view, could they. In particular, having a plan to deal with dogs in such a manner might actually enhance officer safety. Here, for example, having MADACC on scene after the kitchen had been cleared would have been highly advantageous. The dogs could have been appropriately restrained, avoiding the need to guard them while the search was ongoing, thus permitting the officers to focus on whether

other individuals were in the non-searched areas of the house. And, outside the facts of this case, having non-lethal means to address dogs that officers might encounter prevents the risks that accompany firing a weapon at them. Shooting at anything always carries the risk of injuring others nearby (including officers), whether it be by ricochet, friendly fire, or an errant shot.

Accordingly, the Court finds, in light of *Viilo*, *Hells Angels*, and *Carroll*, that the City defendants are not entitled to qualified immunity on Flint's Fourth Amendment seizure claim. Consequently, both Flint's and the City defendants' motions for summary judgment will be denied on this claim, except as noted below.

### 3.1.5 The Unlawful Seizure Claim Against Officers Hewitt and Colker Cannot Proceed

The City defendants, in their motion for summary judgment, argue that Officers Hewitt and Colker were not personally involved in the seizure of Flint's dogs. (Docket #54 at 10). Indeed, "[i]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'" *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (quoting *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003)).

While Flint's complaint alleges this claim against Officers Hewitt and Colker (*see* Docket #41, ¶502), Flint did not respond to the City defendants' argument in their brief in opposition (*see* Docket #68), nor did Flint allege Officers Hewitt and Colker were personally involved in the shooting of her dogs in her own motion for summary judgment. (*See* Docket #50). Alas, buried in a footnote Flint states that she is not proceeding on the unlawful seizure claim against Officers Hewitt and Colker. Accordingly, the Court is obliged to grant summary judgment in favor of Officers Hewitt and Colker on this claim.

### 3.1.6 Flint's Failure to Intervene Claim Relating to the Shooting of the Dogs Will Also Proceed to a Jury

In their motion for summary judgment, the City defendants also argue that Flint cannot maintain a failure to intervene claim against any of the City defendants relating to her unlawful seizure claim. Flint did not move for summary judgment on this claim, and merely opposes the City defendants' motion.

"Omissions as well as actions may violate civil rights. Generally, however, the Constitution creates only negative duties for state actors." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). However, even as a bystander, an officer can be held liable under § 1983 if Flint can show the officer: "(1) had reason to know that a fellow officer was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring." *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009); *see Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

"A realistic opportunity to intervene may exist whenever an officer could have called for a backup, called for help, or at least cautioned the violating officer to stop." *Miller v. City of Harvey*, No. 13-CV-9257, 2014 WL 3509760, at *2 (N.D. Ill. July 15, 2014) (internal quotation marks omitted). Liability applies to supervisory and nonsupervisory officers alike. *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997).

The Court will permit Flint's failure to intervene claim—except against Officers Hewitt and Colker—to proceed to a jury for the same reasons noted earlier. This makes sense, given that "[w]hether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the

evidence, a reasonable jury could not possibly conclude otherwise." *Id.*

### 3.2 Unlawful Detention Claim Against the City Defendants and Deputy Jonas

Flint also brings a claim for unlawful detention against the City defendants and Deputy Jonas. Flint alleges that she was detained for an unreasonable amount of time because the City defendants erroneously charged her with felonies. She also alleges that Deputy Jonas continued this unreasonable detention by not correcting the City defendants' error when she arrived at the County jail  The Court will begin by outlining the undisputed facts applicable to both the City defendants and Deputy Jonas before turning to the claim as it pertains to each, individually.

#### 3.2.1 Undisputed Facts

After the shooting of the dogs, the City defendants continued the search of Flint's house until 3:40 p.m. (Docket #26, Ex.1 at 3).  During that time—and also during the time before the dogs were shot—officers observed a litany of animals within the house, including alligators, crocodiles, turtles, large snakes, rats, mice, and spiders.  (*E.g.,* Docket #52, Ex. O (DVD)); (Docket #52, Ex. G at 1); (Docket #26, Ex.1 at 2-3).

During the search, DNR Warden Blankenheim positively identified an ornate box turtle in the house, which is an endangered species and illegal to possess without a special permit; he relayed this information to Detective Simmert. (Docket #69, ¶ 87); (Docket #75, ¶ 98). DNR Warden Blankenheim also informed the officers that possession of the turtle was a felony, under Wis. Stat. § 29.604. (Docket #75, ¶ 97). Lt. Felician had no independent knowledge of that statute, so he relied solely on DNR Warden Blankenheim's statement that it was a felony. (Felician Dep. at 67:7-68:18). Detective Simmert also believed a violation of that statute was a felony. (Simmert Dep. at 92:1-

13). Both Lt. Felician and Detective Simmert were mistaken, and the City defendants admit as much. (*See* Docket #54 at 21) (noting that Wis. Stat. § 29.604 "does only provide for a misdemeanor penalty under state law for the intentional possession of a wild animal on the state's endangered species list and so was mistakenly described by Detective Simmert as a felony").

During the search, the officers observed conditions for the animals that were quite disconcerting. (*See, e.g.*, Simmert Dep. at 110:20-22) (referring to the conditions as "deplorable"); (Felician Dep. at 69:18-20, 69:25-70:22) (stating that the conditions were "abysmal" and that "the place was absolutely filthy," with "the top floor, where these animals were being housed[,] was rotting"). In addition, the officers observed animal "carcasses" in the house, including that of an alligator or a crocodile, mice and rats, and perhaps a snake. (*See* Hewitt Dep. at 89:1-91:5) (observing dead alligator or crocodile and a dead snake); (Simmert Dep. at 89:7-90:22) (observing dead rats and mice which were feeder animals for the carnivores and a dead alligator in a sealed off bin).

In light of the foregoing conditions, Lt. Felician and Detective Simmert made the decision to arrest Flint. (Docket #69, ¶ 88); (Docket #75, ¶ 96). Detective Simmert directed Officer Hewitt to place Flint in custody at 3:09 p.m.; however, Officer Hewitt had no part in the decision to arrest Flint other than following the instructions given to her. (Docket #69, ¶ 91) Detective Simmert instructed Officer Hewitt to arrest Flint on two felony charges: (1) Wis. Stat. § 29.604; and (2) Wis. Stat. § 951.02, which criminalizes cruelty to animals. (Simmert Dep. at 124:16-125:6). On what is called a "blue card," which listed the violations Flint was arrested on, both crimes were denoted

as felonies. (*See* Docket #69, ¶ 90).[10] However, Lt. Felician testified at his deposition that he was aware that the animal cruelty charge as it pertained to Flint was merely a misdemeanor. (Felician Dep. 69:4-6).

While Flint was arrested on a felony charge of Wis. Stat. § 951.02 —which has a range of penalties, from a fine all the way up to imprisonment if it is a felony—Detective Simmert stated in his deposition that he was arresting Flint only for not having the animals properly fed, sheltered, or watered. (Simmert Dep. at 111:25-112:10). Those offenses, however, could only rise to the level of a misdemeanor and are normally charged under a different statute altogether. *See* Wis. Stat. §§ 951.13, 951.14. Additionally, when speaking with Flint during her arrest, Detective Simmert told her she was being arrested because "the conditions inside of [the house] were deplorable, and that clearly she wasn't caring for the animals." (Simmert Dep. at 110:18-111:1). He also testified at his deposition that he may have had further dialogue with Flint and said something to the effect of "'I don't think you're an evil person. I think you just got in over your head.'" *Id.*

The search of the house was eventually ceased at 3:40 p.m. when it was determined that the house was a hazard; the house was sealed and placarded until the officers could return with proper safety equipment and personnel. (*See* Docket #75, ¶ 104); (Docket #26, Ex. 1 at 3). Shortly thereafter, some of the officers traveled to Cullen's residence and executed the other search warrant Detective Simmert had obtained.

Officer Colker arrived at Flint's residence at 3:27 p.m., just before the search was called off; he did not enter the premises and merely transported

---

[10]The parties dispute whether Officer Hewitt or Detective Simmert filled out this card. *(See* Docket #69, ¶ 90)

Flint to MPD's District 2 police station for booking on the charges noted above. (*See* Docket #69, ¶ 97). Flint's Arrest and Detention Report indicates that the arresting officers were Officers Hewitt and Colker and the charges against Flint were "Viol/Endang/Threat S" under Wis. Stat. § 29.604 and "Intentionally Mistreat" under Wis. Stat. § 951.02. (Docket #38, Ex. 3 at 2). Both crimes are listed as "F," indicating they were charged as felonies.

Detective Simmert drafted a probable cause statement that evening, which was notarized and signed by Lt. Felician at 10:37 p.m. (*See* Docket #52, Ex. G at 1); (Simmert Dep. at 125:7-23). The probable cause statement lists the same offenses against Flint, except that the Wis. Stat. § 951.02 charge, which was previously denoted as "Intentionally Mistreat" on the Arrest and Detention Report, is now listed as "Mistreating animals." (Docket #52, Ex. G at 1). The statement begins by stating that the search warrant MPD executed was obtained "specifically" for the purpose of locating endangered species "kept by [] Jane E. Flint," and describes the basis for her arrest as follows:

> Upon making entry, I observed animals numbering in the 100's, including alligators, crocodiles, turtles, and spiders. Warden Nick Blankenheim…and members from [MADACC] were present. These trained professionals did positively identify one recovered species as being a Chinese Alligator which is classified as critically endangered and illegal to possess. Due to public health concerns, the Department of Neighborhood Services declared the residence unfit for human or animal habitation. There was an overpowering stench of ammonia consistent with urine and feces throughout the residence. Dead animal carcasses were in close proximity to live animals, and animal waste was observed throughout the residence. In the basement area alone, mice and rats numbering in the 100's formed a carpet on the basement floor. The conditions of the animals were as follows: mold and fungus growing on a vast majority of the animals; alligators, crocodiles, and turtles were kept in containers which did not

allow them to turn around in their containers and were filled with animal waste….Further endangered animals are in the residence, but specific species and genus could not be established based on the public health hazard.

*Id.*

Detective Simmert, after submitting the probable cause statement (a copy of which goes to the City Jail), placed a hold on Flint so that he could speak with her sometime later. (Simmert Dep. at 125:24-128:2). The hold would prevent her from being released until Detective Simmert directed otherwise. *Id.*

The search of Flint's residence continued on May 13, 2010. (Docket #69, ¶ 98). Sometime late that day, Detective Simmert went to speak with Flint and obtain a statement from her. (Simmert Dep. at 127:4-128:2). Detective Simmert stated that the delay in speaking with Flint was due to the continuing search at Flint's residence and also a search the previous day at Cullen's residence. (Simmert Dep. at 153:9-154:6) (noting that it took "16 hours worth of work on the 13th" at Flint's residence). Flint told Detective Simmert that she did not want to make a statement without an attorney present. *Id.* So, Flint was released back to her jail cell and then Detective Simmert filled out an "Order to Release" which served to transfer Flint to the Milwaukee County Jail. *Id.*; (Docket #75, ¶114). She was transferred to Milwaukee County Jail, according to Detective Simmert, because "we were asking the courts to hold her on…felony charges.…You go to the county jail because that's where the court system is, where a commissioner would find probable cause, and that's where the bail reviews and all that stuff goes on." (Simmert Dep. at 134:19-135:3). If a person is not charged with a felony, that person automatically has bail set pursuant to a state statute and a bail schedule. (Docket #69, ¶ 99); (Docket #71, ¶ 28).

Flint was transported to the Milwaukee County Jail around 11:30 p.m. on May 13, 2010, and transferred into the custody of the County. (Docket #67, ¶ 117). Deputy Jonas was the intake officer at the County Jail and reviewed Flint's Arrest and Detention Report and the probable cause statement. (Docket #71, ¶ 34); (Docket #67, ¶ 119). Deputy Jonas researched the two statutes to determine if the documents he received were correct. (Docket #71, ¶ 34). He could not find Wis. Stat. § 29.604 and thus assumed that it was a felony based on the documents from MPD. (Docket #67, ¶ 124). Deputy Jonas also questioned whether the Wis. Stat. § 951.02 should actually be a felony, at least at first. *Id.* ¶ 121. However, after looking up the statute and observing that a felony was possible under § 951.02, *see* Wis. Stat. § 951.18, he believed that the crime was properly a felony. *Id.* This was so, according to Deputy Jonas, because the probable cause statement referred to "dead animal carcasses," and § 951.18(1) states, *interalia*, that "[a]ny person who intentionally violates § 951.02, resulting in the mutilation, disfigurement or death of an animal, is guilty of a Class I felony." (Docket #67, ¶ 121). However, Deputy Jonas later admitted during his deposition that his belief that dead animal carcasses were sufficient to raise the charge to a felony was erroneous. (Docket #79, ¶ 50). He also stated that if he wanted to, he could have called MPD to clarify whether that charge was intended to be a felony. (Docket #79, ¶ 51).

Deputy Jonas also knew that when those charges are entered into the computer system at the County Jail by the clerk, the computer would tell them whether or not the charges were actually felonies. (Docket #67, ¶ 125); (Docket #71, ¶¶ 27, 35). The County's computer printout shows that the § 951.02 charge could be a felony and the § 29.604 was listed as "O/U," which stands for ordinance, unclassified. (Docket #67, ¶¶ 125-127). Having

confirmed that at least one of the crimes was a felony, Deputy Jonas marked "FEL" on the paperwork for both charges, indicating that both charges were felonies and thus making bail unavailable to Flint. (Docket #79, ¶ 55). Had the § 951.02 charge ultimately been determined, by whatever means, to only be a misdemeanor, Flint would have been automatically subject to $500.00 bail and would not have been required to wait for a judge to set bail. *Id.* at ¶ 57.

Flint was eventually brought before a County Commissioner at 1:46 p.m. on May 14, 2010; the commissioner found probable cause for two felonies and set cash bail at $15,000.00. (Docket #79, ¶ 62); (Docket #71, ¶ 36); (Docket #67, ¶ 131). Flint was later bailed out by a friend early the next morning. (Docket #67, ¶ 133). Deputy Jonas was the release officer and went through the same process of reviewing everything upon her release as he did on intake. *Id.* at ¶ 134. According to the probable cause determination paperwork, Flint was in custody for 46 hours and 43 minutes before probable cause was found by the court commissioner. (Docket #71, ¶ 37).

A criminal complaint was filed against Flint on May 27, 2010, but did not charge her with a felony. (Docket #67, ¶¶135-136).[11] Eventually, all of the misdemeanor and forfeiture charges against Flint were dismissed with prejudice; to date, she has not been convicted of any offense. (Docket #67, ¶¶ 138-139).[12]

---

[11]The defendants have objected to this fact on relevancy grounds; the Court overrules that objection.

[12]The defendants have objected to this fact on relevancy grounds; the Court overrules that objection.

### 3.2.2 Wisconsin Statutes Applicable to Flint's Unlawful Detention Claim

Before the Court turns to the parties' arguments, the Court will outline the relevant statutes that govern all of its analysis. Specifically, the criminal statutes that Flint was charged with violating. First, Wis. Stat. § 29.604(4)(a) states that, "[n]o person may…possess…within this state any wild animal specified by the department's endangered and threatened species list." It is undisputed that the Ornate Box Turtle that was found at Flint's house was on the endangered and threatened species list. The statute provides that, "[w]hoever violates sub. (4)(a) shall forfeit not less than $500 nor more than $2,000. Whoever intentionally violates sub. (4)(a) shall be fined not less than $2,000 nor more than $5,000 or imprisoned for not more than 9 months or both." § 29.604(5)(a)(1).

Therefore, a violation of the statute is either a forfeiture, or if it is violated intentionally, could involve a prison term. Because the statute does not state whether it is a felony or a misdemeanor, one must look to Wis. Stat. § 973.02 which states that if a statute authorizes imprisonment but does not define where the place of imprisonment is, then "a sentence of less than one year shall be to the county jail…" And, turning to Wis. Stat. § 939.60, leads to the conclusion that § 29.604(4)(a) is a misdemeanor, given that § 939.60 states that any crime that is not punishable by imprisonment in the Wisconsin state prisons is a misdemeanor.

Second, § 951.02 states that, "[n]o person may treat any animal, whether belonging to the person or another, in a cruel manner…" The word "cruel" is defined in § 951.01(2) as "causing unnecessary and excessive pain or suffering or unjustifiable injury or death." The penalties for violations of the statute are either a forfeiture, a misdemeanor, or a Class I Felony. To wit:

"Any person violating § 951.02 is subject to a Class C forfeiture.…Any person who intentionally or negligently violates [*inter alia*, § 951.02] is guilty of a Class A misdemeanor. Any person who intentionally violates § 951.02, resulting in the mutilation, disfigurement or death of an animal, is guilty of a Class I felony" § 951.18(1).

Two other statutes are also relevant: § 951.13, which criminalizes the failure to provide proper food and drink to confined animals, and § 951.14, which criminalizes the failure to provide proper shelter (*i.e.* the proper temperature, ventilation, space, and sanitation). Violations of either §§ 951.13 or 951.14 are at most Class A misdemeanors. *See* § 951.18.(1).

### 3.2.3 Legal Standard for Unlawful Detention

"The Fourth Amendment protects against unreasonable seizures; an arrest is a seizure, and the Fourth Amendment affords persons who are arrested the further, distinct right to a judicial determination of probable cause 'as a prerequisite to extended restraint of liberty following arrest.'" *Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)). In *Gerstein*, the Supreme Court held the judicial determination of probable cause must be "prompt," a holding that "acknowledges that prolonged pretrial detention occasions serious interference with liberty rights." *Willis v. City of Chicago*, 999 F.2d 284, 287 (7th Cir. 1993). And, in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) the Court refined "prompt" with the "general rule that persons arrested without a warrant must receive a judicial determination of probable cause within 48 hours." *Lopez*, 464 F.3d at 719 (citing *McLaughlin*, 500 U.S. at 56-57).

*Riverside's* rule established a "48-hour burden-shifting approach," meaning, as applicable here, that detentions less than 48 hours are presumptively reasonable and "the arrested person bears the burden of

establishing that the length of his custody is nonetheless unreasonable." *Portis v. City of Chicago*, 613 F.3d 702, 704 (7th Cir. 2010). In *Riverside*, the Supreme Court gave examples of unreasonable delays: "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." 500 U.S. at 56. The Seventh Circuit has also held that "prolonging the detention of an arrestee to investigate crimes other than the one for which he had been arrested" runs afoul of *Riverside*. *Wells v. City of Chicago*, 2010 WL 116040, at *6 (N.D. Ill. Jan. 16, 2012) (citing *Willis v. City of Chicago*, 999 F.2d 284, 288-89 (7th Cir. 1993)).

It must be noted, however, that "the 48-hour burden shifting approach does not apply when the police don't plan to present the suspect to a magistrate for a probable-cause hearing." *Portis*, 613 F.3d at 704. This is often the case when a statutory bail schedule directs that persons arrested for minor offenses (typically forfeitures, fines, and most misdemeanors) be granted cash bail and released from custody. In these situations, an "officer's 'on-the-scene assessment of probable cause' justifies an arrest and 'a brief period of detention to take the administrative steps incident to arrest.'" *Chortek*, 356 F.3d 740, 746 (7th Cir. 2004). The length of time taken to complete these administrative steps must be reasonable in light of the circumstances, *see Portis*, 613 F.3d at 704 (noting that "*McLaughlin* tells us that reasonableness must be assessed one case at a time" and "'courts must allow a substantial degree of flexibility'") (quoting *Riverside*, 500 U.S. at 56).

However, the Seventh Circuit has suggested that "[i]f police choose to perform time-consuming tasks after an arrest, perhaps they must do so on their own time rather than the suspect's, issuing a citation rather than keeping the suspect locked up in the interim." *Gramenos v. Jewel Cos., Inc.*, 797

F.2d 432, 437 (7th Cir. 1986). In that vein, the Seventh Circuit has twice required an explanation for delays of less than five hours. *See Gramenos,* 797 F.3d at 437; *Moore v. Marketplace Rest., Inc.*, 754 F.3d 1336 (7th Cir. 1985).

### 3.2.4 The Unlawful Detention Claim Against the City Defendants[13]

#### 3.2.4.1 The Parties' Arguments

Flint asserts that the City defendants unlawfully detained her because they made an unreasonable mistake of law in detaining her for two felonies, when the facts and relevant law could only support forfeiture or misdemeanor charges. (Docket #50 at 20). Because of this mistake, she was required to wait for a judicial probable cause determination instead being released according to the statutorily defined bail schedule. *Id.* at 22. Flint also alleges that Detective Simmert made false statements and material omissions in his probable cause statement that effectively ensured that she would be detained for an unreasonable amount of time. *Id.* at 25. Additionally, she alleges that Detective Simmert held her for additional time in the hopes that he could extract information about Cullen, and implied that if she talked, she would be released. *Id.* at 20. Flint also asserts that her detention was unreasonably delayed because the City defendants spent the day after her arrest gathering additional evidence to justify her arrest, which is impermissible. *See, e.g., Wells v. City of Chicago*, 2010 WL 116040, at *5 (N.D. Ill. Jan. 16, 2012) (noting that "delay for gathering additional evidence to justify the arrest is unreasonable") (internal quotation marks omitted).

---

[13]Flint's complaint alleges unlawful detention against all of the defendants. (Docket #41 at 17). However, Sgt. Jackson and Officers Mourty and Daugherty clearly had nothing to do with her arrest or detention. The unlawful detention claim against all three, to the extent there ever was one, will be dismissed.

Conversely, the City defendants argue that, while Flint may have erroneously been arrested and detained on a felony charge pertaining to the endangered species statute, that alone is irrelevant given that she could properly be detained on a felony violation of Wis. Stat. § 951.02. (Docket #54 at 21). In particular, the City defendants argue that the presence of the dead animals and the conditions of the house were sufficient to show that Flint intended to treat the animals cruelly which resulted in their death, thereby allowing for detention on a felony charge, pursuant to §§ 951.02 and 951.18(1). *Id.* at 22. ("It…appeared to a reasonable layperson in their position [at] that time that the animals were treated in a cruel fashion," resulting in the death of at least one alligator); (Docket #73 at 12) ("[Detective] Simmert and [Lt.] Felician did not have to have evidence…that Flint had intended to kill any of the animals, but, rather, that she intended to treat them in a cruel manner."). And, the City defendants argue that even if they did make mistakes of law regarding the statutes Flint was charged under, those mistakes were reasonable and thus permissible under *Heien.*

As to Flint's contention that she was impermissibly detained to shore up her arrest, the City defendants flatly deny this claim as unsupported by the evidence. (Docket #81 at 12). As to why Flint was held without a probable cause determination all day May 13, 2010, the City defendants point to "the extensive and more than day-long search of [her] property that occurred the day after the warrant execution." *Id.* at 10; *see id.* at 11 (explaining further that "the officers would have been derelict in their duties if they had not thoroughly searched [Flint's residence]…on the day following Flint's arrest." But, the City defendants assert that the subsequent search was not "required in order to gather evidence to 'justify the arrest' because evidence had

already been obtained in the short-circuited search on the day the warrant was executed." *Id.*

Finally, the City defendants argue that they are entitled to qualified immunity on Flint's unlawful detention claim because, in sum, Flint has not come forward with similar cases showing that the violations she alleges ran afoul of a clearly established right.

The Court will first address whether the City defendants made reasonable mistakes of law in interpreting the two statutes that Flint was arrested and detained on. Afterwards, the Court will address the balance of the City defendants' and Flint's arguments to determine whether summary judgment is appropriate for either party on the unlawful detention claim.

### 3.2.4.2  The City Defendants Did Not Make Reasonable Mistakes of Law

The City defendants argue that, even if what they asserted as probable cause for Flint's arrest on the felony animal mistreatment charge was insufficient to detain her because it was merely a misdemeanor (or, perhaps, a forfeiture), that mistake was a reasonable mistake of law. And the City defendants parrot that argument as it pertains to the endangered species charge.

The Supreme Court held, a few short months ago, "that reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition." *Heien*, 135 S.Ct. at 536. As the Court put it, "reasonable men make mistakes of law, too, and such mistakes are no less compatible with the concept of reasonable suspicion." *Id.* The Supreme Court made clear, however, that the Fourth Amendment only tolerates objectively reasonable mistakes of law and those mistakes cannot be the product of an officer's "sloppy study of the laws he is duty-bound to enforce." *Id.* at 539; *see also id.*

at 541 (Kagan, J., concurring) (explaining that "the government cannot defend an officer's mistaken legal interpretation on the ground that the officer was unaware of or untrained in the law").

The Supreme Court's decision is further cabined by the question presented to it, which it summarized as: "Whether a police officer's mistake of law can provide the individualized suspicion that the Fourth Amendment requires to justify a traffic stop." *See Heien v. North Carolina*, No. 13-604, Question Presented, *available at* http://www.supremecourt.gov/qp/13-00604qp.pdf (last visited March 3, 2015). The Court made no indication that its holding was meant to encompass determinations of probable cause to arrest, or, for that matter, any reasonable mistake of law outside of those made to justify reasonable suspicion. *See Heien*, 135 S.Ct. at 540 (Kagan, J., concurring) (noting that the Court's opinion "explains why certain mistakes of law can support the reasonable suspicion need to stop a vehicle under the Fourth Amendment").

Finally, the Court noted that ignorance of the law continues to be an impermissible excuse for police officers, just as it is for the citizenry. *Id.* at 540. Thus, its holding does not change that "the government cannot impose criminal liability based on a mistaken understanding of the law"; however, from that it does not follow that reasonable mistakes "cannot justify an investigatory stop." *Id.* Stated another way, reasonable mistakes of law can justify the seizure incident to an investigatory stop, but even reasonable mistakes cannot justify imposing criminal liability founded on misconceptions about the scope or application of the law.

There also appears, in this Court's view, to be a condition precedent to even asserting that a mistake of law is reasonable. That is, as stated by Justice Kagan in her concurrence, that the statute be "genuinely ambiguous,

such that overturning the officer's judgment requires hard interpretive work." *Id.* at 541 (Kagan, J., concurring) ("The critical point is that the statute poses a quite difficult question of interpretation…"). If the statute is not, then officers are effectively foreclosed from arguing that any mistake of law predicated on that statute could be objectively reasonable. The point to be made in expounding upon all of this is that *Heien*'s reach is to those "exceedingly rare" cases where truly conflicting yet objectively reasonable interpretations of the law are possible. *See id.*

Against the foregoing backdrop, the Court has qualms about even applying *Heien* here, given that this is not a reasonable suspicion case. *But see J Mack LLC v. Leonard*, No. 13-CV-808, 2015 U.S. Dist. LEXIS 15259, at *22 (S.D. Ohio Feb. 9, 2015) (stating that the court "has no reservation in extending *Heien's* rational to the probable cause analysis, especially given that the Supreme Court's decision is based in part on nineteenth century precedent that it characterized as establishing the proposition that a mistake of law can support a finding of probable cause"). Nevertheless, the Court will analyze the City defendants' arguments in light of *Heien* for the sake of clarity.

First, the City defendants argue that "*Heien* now establishes that the [endangered species] arrest as a felony was 'reasonable'…because an officer could reasonably rely upon the DNR's classification of the violation as a felony." (Docket #87 at 4); *id.* at 5 ("Warden Blankenheim's apparently-credible word that the possession of the turtles was a felony under Wisconsin law provided a reasonable basis for [Lt.] Felician and Detective Simmert to arrest Flint for that offense as a felony."). The City defendants' argument fails, however, because *Heien* simply does not apply. Relying on DNR Warden Blankenheim's own mistake of law does not involve Lt. Felician and

Detective Simmert reasonably misinterpreting an ambiguous statute. Rather, it underscores their own lack of knowledge about the statute *ab initio*. An officer cannot make a reasonable mistake about the law or the facts if he has no knowledge of either. *See Heien*, 135 S.Ct. at 541 (Kagan, J., concurring) ("…the government cannot defend an officer's mistaken legal interpretation on the ground that the officer was unaware of…the law").

Second, the City defendants argue that "even if *Heien* were only to apply to legal determinations made by the officers themselves, [Lt.] Felician and Detective Simmert could still have reached the reasonable, though mistaken, conclusion that the possession of the endangered species was a felony rather than a misdemeanor." (Docket #87 at 5). This, the City defendants assert, would not be through some slipshod study of the statute, but because "[i]t takes…a relatively complex analysis of several statutes before one can determine the nature of such a violation." *Id.* The City defendants describe this process as "strikingly similar to the complicated analysis" that faced the officer in *Heien. Id.* at 8. So, the City defendants conclude, "these officers, in analyzing the pertinent statutes, *could have made a 'reasonable mistake of law' and concluded that the violation of the endangered species law…was a felony*." *Id.* (emphasis added). And, consequently, the officers "would have acted reasonably in processing Flint's arrest on this charge as a felony and not a misdemeanor." *Id.*

The Court disagrees. This argument fails for the same reason the first argument did; the officers *did not know the law* and thus could not make a reasonable mistake about it. *Heien* involved an officer making a reasonable mistake of law based on his *understanding of the law*; and the mistake was a reasonable one because conflicting interpretations of the statute—as evidenced by later judicial decisions that struggled to interpret it—resulted

in different, but objectively reasonable conclusions as to its applicability. The City defendants' use of the phrases "could…have reached the reasonable…conclusion" and "could have made a 'reasonable mistake of law'" crystallize the fallacy of this argument. Namely, *Heien* does not stand for the proposition that lack of knowledge about or sloppy study of a statute can be transformed into a reasonable mistake of law by hypothesizing that the statute could be ambiguous or confusing. Officers cannot shore up their lack of knowledge by proposing that if they had properly reviewed the law they would have been nonetheless confused, thus justifying their mistake. Especially when officers choose to *arrest* someone for a violation of that law.

Finally, even if the Court were to entertain this argument, the City defendants' route to determine that § 29.604(4)(a) is a misdemeanor is only "complex" because they made it so. In reality, one must merely read three statutes. And, they are abundantly clear. This is not difficult interpretive work. Plus, even if "a relatively complex analysis of several statutes" is required to determine the punishment, that does not make the statute ambiguous or permit two reasonable interpretations of its scope. Statutes frequently cross-reference each other and require some effort to connect the dots. If reasonable mistakes of law were permitted on this basis alone (without showing concomitant ambiguity), virtually no mistakes of law would be unreasonable, given the often dense and inartful structure of such statues, *writ large.*

The Court finds that the City defendants made an unreasonable mistake of law by detaining Flint on the imaginary charge of *felony* possession of an endangered/threatened species. As noted above, the City defendants readily admit that this was a mistake. And, despite their bandying about in an attempt to frame the mistake as reasonable, it is no

such thing given that Lt. Felician admitted to having no independent knowledge of the statute and he, along with Detective Simmert, based their belief that the statute was a felony on the word of DNR Warden Blankenheim. *Cf. Reynolds v. Jamison*, 488 F.3d 756, 768 (7th Cir. 2007) ("[The collective knowledge] doctrine permits arresting officers to rely on the *knowledge*, but not necessarily the conclusions (such as whether probable cause exists), of other officers."); *Woods v. Indiana University-Purdue University*, 996 F.3d 880, 887 (7th Cir. 1993) (noting that, "in essence, all public officials are presumed to know clearly established law, whether or not they have in fact ever cracked a law book.").

The City defendants' third argument—which focuses on §§ 951.02 and 951.18(1)—is that even if the officers "somehow lacked the requisite basis for [the animal mistreatment] felony arrest, *Heien* now makes clear that an officer in their position would reasonably conclude that there was probable cause for such an arrest." (Docket #87 at 9). This is so, the City defendants explain, because it is possible to interpret § 951.02 to allow a cruelty to animals charge for failing to provide food, water, or shelter. As the City defendants explain, "it would certainly be possible for a person to inflict 'unnecessary and excessive pain or suffering or unjustifiable injury or death' by starving an animal, failing to provide it with water as required, or otherwise failing to provide proper shelter." (Docket #87 at 10).

The City defendants go on to note that §§ 951.02 and 951.18(1) were interpreted by the Wisconsin Court of Appeals in 2012, and the court held that a Class I Felony for intentionally violating §§ 951.02 and 951.18(1) did not require the intent to cause death, disfigurement, or mutilation of an

animal but merely the intent to treat the animal in a cruel manner. *See State v. Klingelhoets*, 814 N.W.2d, 885, 890, 341 Wis. 2d 432 (Ct. App. 2012).[14]

Based on the foregoing, the City defendants state that its analysis (and that of the court in *Klingelhoets*) "undermines Flint's contention that all instances of a failure to provide food, water, and shelter can only amount to a misdemeanor." (Docket #87 at 11). Thus, the officers, after observing the dead carcasses and the deplorable conditions in the premises, could "reasonably conclude that both felony elements of §§ 951.02 and 951.18(1) had been met. The animals had been treated in a 'cruel' manner, that is, they have been subjected to 'unnecessary and excessive pain or suffering or unjustifiable injury or death.'" *Id.* And, "that intended cruel treatment resulted in the death of the animal." *Id.*

This argument is somewhat confusing, but if the Court understands it correctly, the City defendants are arguing that § 951.02 was indeed the correct charge because they could have reasonably concluded that a felony violation of that statute can occur solely on the lack of food, water, and shelter they observed, coupled with the officers' observations of the conditions of the house and the presence of animal carcasses.

The Court agrees that, in certain circumstances, the failure to feed, provide water or shelter for an animal, if done with the intent to "caus[e] unnecessary and excessive pain or suffering or unjustifiable injury or death,"

---

[14]It should be noted that *Klingelhoets* was issued after the events in this case, so perhaps its holding should not fit into the calculus here. *See Herrera v. City of Albuquerque*, 589 F.3d 1064, 1071 (10th Cir. 2009) (noting whether probable case exists at the time of arrest is governed by cases published before the arrest). Nevertheless, *Klingelhoets* nowhere stated that the statutes at issue were ambiguous, which significantly undercuts the City defendants' own reasonable mistake of law argument. And, in the end, the holding in *Klingelhoets* has no effect on the Court's instant order.

§ 951.02, resulting in death, disfigurement, or mutilation of that animal, could permit a felony arrest. But, this is not a mistaken reading of the statute; it is a reasonable interpretation of it. Thus, it cannot be a mistake of law.

In light of the foregoing, the Court is unpersuaded by the City defendants' arguments that they made reasonable mistakes of law regarding the two statutes at issue. At bottom, all of their arguments fall outside the scope of *Heien* by failing to actually allege reasonable mistakes of law. Instead, they are either: (1) impermissible attempts to transform lack of knowledge into a reasonable mistake of law; or (2) permissible readings of the statute, which do not demonstrate a mistaken understanding of the law.

### 3.2.4.3   A Jury Could Find the City Defendants Unreasonably Detained Flint

As the City defendants correctly argue, their mistake regarding the endangered species charge could not, standing alone, prolong Flint's detention if she was properly detained on the felony animal mistreatment charge. The Court will now turn to that issue.

The Court finds that no matter what reading of the statute the City defendants allege could have been the basis for a felony animal mistreatment charge, they cannot escape one fatal flaw: intentional conduct is required, *see Klingelhoets*, 814 N.W.2d at 890 (stating that intentional animal requires "that "'the thing' or 'the result' the actor had 'the purpose to do' or 'cause' is unnecessary and excessive pain or suffering or unjustifiable injury or death") (quoting Wis. Stat § 939.23(3)), and the City defendants gloss over this element. *See, e.g., Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 622 (7th Cir. 2010) ("A police officer's probable cause determination depends on the elements of the applicable criminal statute.").

While it is true that probable cause does not "require the same type of specific evidence of each element of the offense as would be needed to support a conviction," *Adams v. Williams,* 407 U.S. 143, 149 (1972), this does not mean that "the police can[] establish probable cause without at least *some* evidence supporting the elements of a particular offense, including the requisite mental state." *Wesby v. District of Columbia*, 765 F.3d 13, 20 (D.C. Cir. 2014).

The City defendants' failure to point to any evidence that Flint's conduct rose to the level of *intending* the unjustifiable death of the animals that ended up as "carcasses," severely undermines this argument. *See BeVier v. Hucal*, 806 F.2d 123, 126 (7th Cir. 1986) (holding that to have probable cause under a statute requiring knowing or willful conduct, officers "needed some evidence" to satisfy this element). As Flint points out, there is nothing in the probable cause statement indicating intent, and not a single officer has testified that they understood the facts to show or held the belief that Flint intended to kill the animals or otherwise intended to treat them cruelly. *See Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999) (observing that "officers may [not] make hasty, unsubstantiated arrests with impunity. Several cases both from this and other circuits, caution against incomplete, poorly conducted investigations").

Of course, the officers' subjective understanding of the facts is irrelevant to whether probable cause exists. *See Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010) ("The Supreme Court has made clear that the probable cause inquiry is an objective one."); *see also Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows ) is irrelevant to the existence of probable cause.") And, officers are permitted "latitude to make reasonable

judgments" and inferences "in light of the circumstances." *Stokes*, 599 F.3d at 624. In addition, "no police officer can truly know another person's subjective intent." *Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007). Thus, probable cause must normally be inferred from circumstantial or indirect evidence. *See Krause v. Bennet*, 887 F.2d 362, 371 (2d Cir. 1989) "[A]cts indicate the intention is an old maxim." *United States v. Martinez*, 96 F.3d 473, 478 n.7 (11th Cir. 1996) (internal quotation marks omitted).

The Court believes that a reasonable jury could find that the City defendants lacked probable cause to arrest and detain Flint on the felony animal cruelty charge. *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) ("The probable cause determination must be made by a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.") (internal quotation marks omitted).

That does not end the inquiry, however. It is undisputed that the City defendants had probable cause to arrest Flint on at least a civil forfeiture or a misdemeanor, regardless of whether the City defendants could not have arrested her for a felony. Therefore, Flint could be detained for a reasonable amount of time incident to her lawful arrest regardless. S*ee Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 682 (7th Cir. 2007) ("An arrested individual is no more seized when he is arrested on three grounds rather than one; and so long as there is a reasonable basis for the arrest, the seizure is justified on that basis even if any other ground cited for the arrest was flawed.").

In the Court's view, whether Flint's approximately forty-seven hour detention was unreasonable is a fact-intensive question that must be left for a jury. *See Chortek v. City of Milwaukee*, 356 F.3d 740, 747 (7th Cir. 2004) (stating that "the reasonableness of a length of detention typically 'is a question best left open for juries to answer based on the facts presented in

each case'") (quoting *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988)); *Wells v. City of Chicago*, 2010 WL 116040, at *6-8. This is so for two reasons.

First, even assuming that Flint was properly detained on the felony animal cruelty charge, the Court finds that Flint has shown that there are sufficient facts to allow a jury to find the *Riverside* 48-hour presumption of reasonableness rebutted. *See Portis*, 613 F.3d 702, 704 (7th Cir. 2010) (noting that "the arrested person bears the burden of establishing that the length of his custody is nonetheless unreasonable"). Flint has shown sufficient facts to infer that the subsequent searches of Cullen's residence on May 12, 2010, and Flint's on May 13, 2010, which delayed her release, could have been for the purpose of shoring up Flint's arrest, using Flint as leverage against Cullen, or investigating other uncharged crimes against her or Cullen.

The City defendants all but conceded as much by stating that Flint was detained while they continued to search her house because "there might have been additional evidence of animal cruelty or…something that would exonerate Flint." (Docket #81 at 11). In addition, Detective Simmert stated that the questions he would have asked Flint if she had not invoked the right to counsel pertained to, *inter alia*, "whether she had responsibility for the care[] of these animals, [and] whose turtle it was." (Simmert Dep. 131:1-5). (*See* Docket #73 at 15) ("[Detective] Simmert merely admitted to the possibility, however remote, that something in a statement by Flint…could have eliminated any charge against her for cruelty to animals and left it solely against Cullen."). Detective Simmert stated that he would also have asked Flint about Cullen's involvement in the animal mistreatment and inquired into the ongoing sexual assault investigation of Cullen. (Simmert Dep. at 132:16-22). The foregoing questions give rise to the inference that the City defendants were not even sure of Flint's culpability and were really

focused on Cullen. *See Tilson v. Forrest City Police Dept.*, 28 F.3d 802, 815 (8th Cir. 1994) ("The jury reasonably could have believed that the parole violation was a mere subterfuge for Tilson's warrantless arrest and detention.").

Second, if the jury finds that the City defendants lacked probable cause to arrest and detain Flint on the felony animal mistreatment charge, which a reasonable jury could find, the unreasonableness of the foregoing delays may become more significant. *Cf. Moore*, 754 F.2d at 1350 ("The principle is clear[,]detention must be justified," and if it is not, "it amounts to punishment prior to conviction").

Notwithstanding the foregoing, a reasonable jury could also find the length of Flint's detention reasonable because the City defendants had probable cause for the felony charge.

In the end, as with Flint's unlawful seizure claim, genuine disputes of material fact, coupled with issues of culpability and credibility that tend to mirror those in the unlawful seizure claim, require that the Court deny both the City defendants' and Flint's motions for summary judgment on the unlawful detention claim, except as outlined below.

### 3.2.4.4   Qualified Immunity Depends on the Jury's Findings

What remains, then, is whether the City defendants are nonetheless entitled to qualified immunity on this claim. At this juncture, it is impossible to answer that question.

To wit, whether the City defendants are entitled to qualified immunity depends upon the jury's answers to each of the following questions: (1) whether the City defendants had probable cause to detain Flint on the felony animal cruelty offense; (2) whether the length of Flint's detention was

unreasonable; and (3) whether the City defendants *intended* to prolong Flint's detention for an impermissible reason.

After these disputes have been resolved by the jury, the City defendants are free to reassert their entitlement to qualified immunity in light of the jury's findings.

### 3.2.4.5 Failure to Intervene Claims Against Officer Hewitt and Lt. Felician

Flint argues that because Lt. Felician and Officer Hewitt approved Detective Simmert's probable cause statement, they were obligated to intervene when they observed "false facts and significant material omissions." (Docket #68 at 23). The City defendants argue that Flint cannot maintain a failure to intervene claim against Officer Hewitt and Lt. Felician because the information in the probable cause statement was consistent with their understanding of the facts and, therefore, they were unaware of any constitutional violation. (Docket #81 at 14).

The Court agrees with the City defendants that Lt. Felician is not liable for failing to intervene. This result obtains because he directly participated in the decision to arrest and detain Flint and thus is personally liable for his own actions. An officer cannot intervene in his own constitutional violation.

As to Officer Hewitt, the Court finds that Flint's failure to intervene claim cannot proceed based solely on Officer Hewitt's review of the probable cause statement. This task, alone, would not provide a sufficient basis to alert her to a constitutional violation; nor is it clear what exactly she could have done, in concrete terms, to intervene.

### 3.2.4.6 Unlawful Detention Claim Against Officers Hewitt and Colker Cannot Proceed

The City defendants also move for dismissal of Officers Hewitt and Colker because they argue that neither was personally involved in the decision to arrest and detain Flint; nor did either officer's conduct contribute in any meaningful way to the length of Flint's detention. (Docket #54 at 12). Flint asserts that the unlawful detention claim should not be dismissed against Officer Hewitt, because she arrested Flint, and Officer Colker because he assisted in the arrest and transported Flint for booking. (Docket #68 at 23-25).

If, perhaps, this were a false arrest case, the Court would be obliged to deny the City defendants' request. However, the simple act of arresting Flint and transporting her to booking did not have any appreciable effect on the length of Flint's detention; these steps would have occurred regardless, no matter what offense—erroneous or not—underlying the arrest. *See Tibbs v. City of Chicago*, 469 F.3d 661, 665 (7th Cir. 2006) (noting that an arresting officer is not responsible for Flint's continuing detention once he turns Flint over to jailers at the police station) (citing *Brown v. Patterson*, 823 F.2d 167, 169 (7th Cir. 1987)). Accordingly, the Court will grant summary judgment in favor of Officers Hewitt and Colker on the unlawful detention claim.

### 3.2.5 Unlawful Detention Claim Against Deputy Jonas

Flint alleges that Deputy Jonas is also liable for unlawful detention because he made an unreasonable mistake of law when he booked Flint into the County Jail. (Docket #50 at 23-24). Plus, Flint argues that Deputy Jonas had a duty to investigate whether there was probable cause to detain her on two felonies. (Docket #76 at 14). In addition, she argues that Deputy Jonas made an unreasonable mistake of law when he concluded that the presence

of animal carcasses next to live animals was sufficient probable cause to detain Flint on felony animal cruelty charges. *Id.* at 23. Lastly, Flint alleges that additional conduct by the County during her detention—high bail and the delay in obtaining a judicial probable cause determination—continued her unlawful detention unreasonably. (Docket #50 at 25).

Deputy Jonas argues that he made no mistake at all during his intake of Flint, but merely reasonably relied on the information that was provided to him by MPD. (Docket #66 at 6). In addition, the County asserts that, while Deputy Jonas did independently review the probable cause statement to determine if Flint could be held on felonies, he came to a reasonable conclusion based on the law he researched and the facts in the probable cause statement. *Id.* at 6-7. Deputy Jonas also argues, similar to the City defendants, that even if he did in fact make a mistake, it was a reasonable mistake of law. (Docket #85 at 5). Finally, Deputy Jonas asserts that his conduct did not run afoul of a clearly established right, thus entitling him to qualified immunity. (Docket #47 at 14-15).

In the Court's view, Flint's claim against Deputy Jonas is plainly foreclosed by *Wood v. Worachek*, where the Seventh Circuit held that:

> generally, a jailer is liable for the illegal detention of an inmate when he unreasonably detains the inmate for arraignment or release, or possesses an affirmative knowledge of the illegality of the arrest. But if the errors upon which liability is asserted take place beyond the scope of his responsibility, he cannot be found liable where he has acted reasonably and in good faith.

618 F.2d 1225, 1231 (7th Cir. 1980)*; see also Dry v. United States*, 235 F.3d 1249, 1259 (10th Cir. 2000) ("We agree with the district court that absent any objectively apparent lack of a basis for a detention which should arouse suspicion, a jailer cannot be expected to assume the mantle of a magistrate to

determine the probable cause for an arrest.") (internal quotation marks omitted).

Here, Deputy Jonas was performing essentially a ministerial task during Flint's intake: that of determining whether the arrest and detention report matched the probable cause statement—two documents that were provided to him by MPD. Any errors in those documents took place "beyond the scope of his responsibility"—that is, if there was no probable cause for Flint's arrest and detention, that error would not be attributable to him—and thus he cannot be held liable for Flint's continued detention so long as he acted reasonably and in good faith. *Worachek*, 618 F.2d at 1225.

And, while Flint rests much of her argument on the fact that Deputy Jonas harbored some doubt as to whether Flint's animal cruelty charge was indeed a felony, this path leads nowhere. This is because he acted in good faith to check that the statute could be a felony; specifically, he looked up the animal cruelty charge in a reference book and compared the probable cause statement to the statute's felony provision. Even if his ultimate determination was erroneous, which Deputy Jonas now admits, it is the process he undertook that determines whether he acted reasonably and in good faith.

The Court finds that Deputy Jonas did not believe or know that Flint's arrest or detention was unlawful, and thus he had no duty to re-investigate Flint's charges or re-examine the sufficiency of the probable cause statement. In addition, he took steps to confirm that at least one of the offenses *could have* been a felony and thus he acted reasonably and in good faith.

Moreover, to the extent that Flint is arguing that jailers must independently assess probable cause for each person they detain, she cites no law in support of this supposed right. Perhaps because no such duty exists in this circuit. *See Worachek*, 618 F.2d at 1225 (stating that "[i]t [is] not the

obligation of jailers to determine whether or not probable cause exist[s] for [an] arrest"). This excludes, however, those situations where the jailer has affirmative knowledge of the illegality of an individual's continued detention and is either personally involved in continuing the detention or fails to intervene despite possessing that knowledge.

In addition, Flint was in the County Jail for under fourteen hours, and she has alleged no viable facts to conclude that this amount of time was unreasonable or the result of an intentional effort by Deputy Jonas to delay her release. At bottom, the full length of Flint's detention is directly attributable to the decisions of the City defendants.

4.    CONCLUSION

In light of the foregoing, the Court is obliged to: deny Flint's motion for partial summary judgment; grant in part and deny in part the City defendants' motion for summary judgment; and, grant the County and Deputy Jonas' motion for summary judgment.

For the sake of clarity, the unlawful seizure claim will proceed against Officers Daugherty and Mourty, Detective Simmert, Lt. Felician, and Sgt. Jackson. Summary judgment will be granted for Officers Hewitt and Colker on the unlawful seizure claim. The corresponding failure to intervene claim will proceed against all of the City defendants, excepting Officers Hewitt and Colker.

The unlawful detention claim will proceed against Detective Simmert and Lt. Felician. Summary judgment will be granted for Officers Hewitt, Colker, Daugherty, and Mourty, and Sgt. Jackson on this claim. No failure to intervene claim for the unlawful detention will proceed.

Accordingly,

IT IS ORDERED that the plaintiff's motion for partial summary judgment (Docket #49) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the County and Deputy Jonas's motion for summary judgment (Docket #43, #48) be and the same is hereby GRANTED; Milwaukee County and Deputy Jonas be and the same are hereby DISMISSED from this action; and

IT IS FURTHER ORDERED that the City defendants' motion for summary judgment (Docket #53) be and the same is hereby GRANTED in part and DENIED in part, as outlined above; Officers Hewitt and Colker be and the same are hereby DISMISSED from this action.

Dated at Milwaukee, Wisconsin, this 20th day of March, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge